## THE KODIAK.

### UNITED STATES v. THE KODIAK.

(District Court, D. Alaska. December 5, 1892.)

1. ADMIRALTY JURISDICTION—"WATERS OF ALASKA"—FORFEITURE—FUR FISHERIES.

Where a vessel is seized for violation of Rev. St. § 1956, forbidding the killing of fur-bearing animals within the limits of Alaska territory, or the waters thereof, such seizure being made within the entrance of Cook's inlet, as determined by a line drawn from Cape Douglas to Point Bede, by a United States vessel acting in pursuance of orders from the government, it must be presumed that such orders were given in the assertion of territorial jurisdiction over the waters of the inlet; and, as the right to such jurisdiction is a political question, the courts will not inquire into it, but will assume jurisdiction as thus determined by the political branch of the government.

2. ALASKAN FUR FISHERIES—FISHING BY NATIVES—TREASURY REGULATIONS.

Rev. St. § 1956, forbids the killing of fur-bearing animals within the limits of Alaska territory, or the waters thereof, but empowers the secretary of the treasury to authorize the killing of such animals, except fur seal, under such regulations as he may prescribe. By an order of April 21, 1879, the secretary forbade the killing of such animals by any other persons than natives, prohibited the use of firearms by the natives during certain months, and declared that no vessel would be allowed to anchor in the well-known otter-killing grounds, except vessels carrying parties of natives to or from such killing grounds. Held, that this regulation was not violated by a fur company which, in pursuance of an agreement made with natives at the beginning of the season, took on board of its ship parties of such natives, and anchored with them in the killing grounds, furnishing them with clothing, provisions, and the necessary outfit, and allowing them to live on board and make hunting excursions therefrom in their canoes, and at the end of the season usually purchasing the skins from them, though each native was free to sell his skins elsewhere; no firearms being used, and no white men taking any part in the hunting or killing, and the natives not being in any way hired or engaged by the company.

In Admiralty. Libel filed in behalf of the United States for the forfeiture of the schooner Kodiak for a violation of Rev. St. § 1956, forbidding the killing of fur-bearing animals within the limits of Alaska territory, or the waters thereof. Libel dismissed.

C. S. Johnson, Dist. Atty.

A. C. Barry and John S. Bugbee, for claimant.

TRUITT, District Judge. The libel which was filed in this case on the 15th of June, 1892, alleges that the schooner Kodiak, on or about the 6th of June, 1892, was seized by Henry L. Johnson, commander of the United States steamer Mohican, in Cook's inlet, in the waters of Alaska, and within the jurisdiction of this court, and then sets out the cause of said seizure as follows:

"That said vessel, her captain, officers, and crew, assisted by a large number of natives of Alaska, were at said time unlawfully engaged in killing, and did kill, fur-bearing animals, known as 'otter,' within the limits of Alaska territory, and in the waters thereof, in violation of the provisions of section 1956 of the Revised Statutes of the United States in such cases made and provided."

This section is as follows:

"No person shall kill any otter, mink, marten, sable, or fur seal, or other fur-bearing animal, within the limits of Alaska territory, or in the waters thereof, and every person guilty thereof shall, for each offense, be fined not less than two hundred nor more than one thousand dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture, and cargo, found engaged in violation of this section, shall be forfeited. But the secretary of the treasury shall have power to authorize the killing of any such mink, marten, sable, or other fur-bearing animal, except fur seal, under such regulations as he may prescribe; and it shall be the duty of the secretary to prevent the killing of any fur seal, and to provide for the execution of the provisions of this section, until it is otherwise provided by law. Nor shall he grant any special privileges under this section."

After the filing of the libel herein, on June 18, 1892, the master of the Kodiak, intervening for and in behalf of the vessel, her tackle, apparel, furniture, and cargo, appeared and alleged that at the time of the seizure of said property he was in possession thereof, and that it belonged to the Alaska Commercial Company, a corporation duly organized under the laws of California. This company in subsequent proceedings appeared as claimant, and on the 4th day of October, 1892, filed an answer to the libel. In this answer, by failing to deny, it admits, the allegations of the libel as to the time, place, manner, and authority of the seizure, but denies any violation of the provisions of section 1956, or any other statute whatever, or the commission of any act which it might not lawfully do under and in pursuance of the authority conferred by regulations of the secretary of the treasury of the United States, issued and prescribed on the 21st of April, 1879. The regulations referred to in this answer were issued by Hon. John Sherman, and are given in the following notice or circular:

"Treasury Department.
"Washington, D. C., April 21, 1879.
"Section 1956 of the Revised Statutes of the United States provides that no person shall, without the consent of the secretary of the treasury, kill any otter, mink, marten, sable, or fur seal, or other fur-bearing animal, within the limits of Alaska territory, or in the waters thereof, and that any person convicted of a violation of that section shall, for each offense, be fined not less than two hundred nor more than one thousand dollars, or be imprisoned not more than six months, or both, and that all vessels, with their tackle, apparel, furniture, and cargo, found engaged in violation of that section, shall be forfeited. No fur-bearing animal will, therefore, be allowed to be killed, by persons other than the natives, within the limits of Alaska territory, or in the waters thereof, except fur seals taken by the Alaska Commercial Company in pursuance of their lease. The use of firearms by the natives in kill-

ing otter during the months of May, June, July, August, and September is hereby prohibited. No vessel will be allowed to anchor in the well-known otter-killing grounds, except those which may carry parties of natives to or from such killing grounds; and it will be the duty of the officers of the United States, who may be in that locality, to take all proper measures to enforce all the pains and penalties of the law against persons found guilty of a violation thereof. White men lawfully married to natives, and residing within the territory, are considered natives, within the meaning of this order.
"John Sherman, Secretary of the Treasury."

Two principal questions arise in this case:

(1) Was the Kodiak, at the time of her seizure, within waters over which the United States had jurisdiction to make the same? and

(2) If so, were the acts proved by the evidence to have been committed a violation of section 1956, under the circular of the secretary of the treasury?

The evidence touching the first question is that the vessel on June 6, 1892, at the time of the seizure, was in latitude 59° 9' N., longitude 152° 41' W., well inside of Cook's inlet, lying in a calm, within sight of the shore, but about 20 miles distant from it, at the nearest point. Cook's inlet is on the eastern side of that portion of Alaska which borders on the Gulf of Alaska. It is about 47 miles wide at its entrance, and extends northward into the mainland a distance of, perhaps, 140 miles. The Kodiak, when seized, was, as shown from the map in evidence, at least three or four miles inside of a line drawn across the entrance to the inlet from Cape Douglas to Point Bede, the nearest headlands, and almost equally distant from them, but somewhat nearer to Cape Douglas. It was contended on behalf of the claimant that these facts show that this court has no jurisdiction to try the case, for the reason that the municipal laws of the United States have no force upon the sea beyond a marine league or three miles from the shore line, and that the statute prohibiting the killing of fur-bearing animals within the limits of Alaska territory, or "in the waters thereof," only means, so far as it applies to the sea, a distance of three miles from the mainland or islands. If this position is correct, congress did a vain and useless thing when it enacted the statute under which this prosecution is had; for, from the nature and habits of the sea otter, if hunters are allowed to come with their vessels and hover along the coast within a few miles of shore, though beyond a marine league therefrom, and kill them, without molestation, then the laws for their protection are futile, and might as well be repealed. But the position is not correct. The contention is not a valid one. In Church v. Hubbart, 2 Cranch, 187, the doctrine is announced that nations may prevent the violation of their laws by seizures on the high seas, in the neighborhood of their own coast, and that there is no fixed rule prescribing the distance from the coast within which such seizures may be made. However, it can hardly be claimed that any portion of Cook's inlet is "high sea," within the accepted meaning of the phrase, for it is well landlocked by islands extending from Kadiak island to Cape Elizabeth, on the east, and can only be entered by coming in near some of these islands, or by the way of Shelikoff straits. In Kent's Commentaries, (volume 1, p. 30,) it is stated that—

"The extent of jurisdiction over adjoining seas is often a question of difficulty and of dubious right. As far as a nation can conveniently occupy, and that occupancy is acquired by prior possession or treaty, the jurisdiction is exclusive. Navigable rivers which flow through a territory and the sea coast adjoining it, and the navigable waters included in bays and between headlands and arms of the sea, belong to the sovereign of the adjoining territory, as being necessary to the safety of the nation and to the undisturbed use of the neighboring shores."

And on the same subject this learned author says:

"Considering the great extent of the American coast, we have a right to claim for fiscal and defensive regulations a liberal extension of maritime jurisdiction. It would not be unreasonable, as I apprehend, to assume, for domestic purposes connected with our safety and welfare, the control of the waters on our coasts, though included within lines stretching from quite distant headlands, as, for instance, from Cape Ann to Cape Cod, and from Nantucket to Montauk point, and from that point to the capes of the Delaware, and from the south cape of Florida to the Mississippi."

In 1849 Mr. Buchanan, secretary of state, declared the claims of the United States to maritime jurisdiction to be embodied in the following proposition:

"The exclusive jurisdiction of a nation extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of the sea inclosed by headlands, and also to the distance of a marine league, or as far as a cannon shot will reach from the shore, along its coasts."

1 Whart. Law Dict. § 32.

The case of The Louisa Simpson, 2 Sawy. 57, was a suit to enforce forfeiture of said vessel for a violation of section 4, Act July 27, 1868, extending the laws relating to customs, commerce, and navigation over the territory of Alaska, and the executive order of February 4, 1870, prohibiting the importation of "distilled spirits into and within the district of Alaska." In the decision by Judge Deady, which was affirmed on appeal, it was held that the simple act of taking these spirits within Kotzebue sound was a violation of the law—

"Because it was an 'importation of distilled spirits into and within the district of Alaska.' The phrase, 'district of Alaska,' as used in this act and executive order, in my judgment, includes that portion of the sea along its coasts which lies inside of a line drawn from the promontory of Point Hope to the Cape Prince of Wales."

Now, it is true that all the waters of this sound are far east of the western line described in the cession of this territory by Russia to the United States by the treaty of March 30, 1867, but the Russian government claimed and exercised the same authority and jurisdiction over the waters of which Cook's inlet is a part as it did over the waters along the western coast of its American possessions, and if the United States now maintains jurisdiction over Kotzebue sound, which is about 160 miles between projecting headlands, not landlocked, and in size more than three times the area of Cook's inlet, it certainly can, with much better claim of right, maintain jurisdiction over the latter. In re Cooper, 143 U. S. 472, 12 Sup. Ct. Rep. 453, which was an application to the supreme court of the United States for a writ of prohibition to the district court of Alaska to restrain the enforcement of a sentence of forfeiture and condemnation against the schooner W. P.

Sayward, upon the grounds that the court was without jurisdiction in the premises, Mr. Chief Justice Fuller, who delivered the opinion of the court, in speaking of the authority for the seizure of the Sayward, said:

"If we assume that the record shows the locality of the alleged offense and seizure as stated, it also shows that the officers of the United States, acting under the orders of their government, seized this vessel, engaged in catching seal, and took her into the nearest port, and that the law officers of the government libeled her, and proceeded against her for the violation of the laws of the United States, in the district court, resulting in her condemnation. How did it happen that the officers received such orders? It must be admitted that they were given in the assertion on the part of this government of territorial jurisdiction over Behring sea to an extent exceeding fifty-nine miles from the shores of Alaska."

To apply this reasoning to the case at bar, it may be said that Commander Johnson, with the United States ship Mohican, was, by orders of the government, cruising along the coast of Alaska, and within the waters of Cook's inlet at the time he made this seizure. How, then, did it happen that he received such orders? It must be presumed, I think, that they were given in the assertion on the part of this government of territorial jurisdiction over these waters. And, if I am correct in this, then it is not the province of courts to participate in the discussion of the questions arising out of this claim of jurisdiction or dominion, for they are of a political nature, and not judicial. National dominion and sovereignty may be extended over the sea as well as over the land, and in our government, when congress and the president assert dominion and sovereignty over any portion of the sea, or over any body of water, the courts are bound by it. In re Cooper, supra; The James G. Swan, 50 Fed. Rep. 108.

These considerations dispose of the first question raised by the claimant. I think this court has jurisdiction of the case.

The next question is as to the sufficiency of the evidence, when applied to the statute and order of the secretary of the treasury, to warrant a decree of condemnation and forfeiture, as prayed for in the libel of information. The claimant corporation was the first lessee of the right to take fur seals under the act of July 1, 1870, entitled "An act to prevent the extermination of fur-bearing animals in Alaska." This lease was executed and delivered August 31, 1870, for the term of 20 years from May 1, 1870. In conducting this business, and in connection with it, this company established trading posts and stores at different points in the territory, for trading with the natives and buying furs, and also owned and operated a number of vessels for use in carrying goods, wares, and different kinds of freight to these trading posts, and in bringing away from them furs and other articles of commerce purchased. In the plant for conducting this extensive business the company invested a large amount of money, and at the expiration of its lease it still kept up these trading posts and continued to do business along its accustomed lines, except as to privileges granted by the lease, and obligations thereby incurred. The Kodiak was one of its vessels used in the ordinary demands of its business. The testimony bearing directly upon the case is not voluminous, and there is no conflict as to the material facts.

The locality of the vessel at the time of her seizure has already been stated. The evidence further shows that at said time she had on board 8 white men, consisting of her necessary officers and crew, and 10 natives or Indians,—about 30 more, who were out hunting, coming on board later in the day; that these natives had their "bedarkes" or canoes with them, and were armed with spears, clubs, and bows and arrows, used by them in hunting and killing fur-bearing animals, especially sea otters; that they had on board the vessel 12 sea otter skins caught on the voyage, and 5 brought on by natives at English bay, and three of these animals, just killed that day, were brought on after the seizure, but that all had been killed by natives, and without the use of firearms. It is positively shown that none of the white men took any part whatever in hunting from the time the vessel started on this trip until seized at Cook's inlet. Conceding these facts, however, the prosecution contends that there was such an arrangement or such collusion between the claimant and the natives as to make it a real party to the killing of these sea otters, and liable to the penalties of the statute. But I do not think the testimony sustains this contention. All the direct evidence there is on this subject comes from the witnesses for the claimant, and from them it appears that the skins of sea otters are very valuable, and the taking of them by the natives is the principal source of revenue from which they make their living. M. S. Washburn is the agent of the claimant at Kadiak, Alaska, and has been in its employ for over 13 years. He testifies that he is well acquainted with the habits and customs of the natives, and of their relations to the company, and its manner of doing business with them; that during the winter the natives sometimes organize hunting parties for taking sea otters, and in the spring, through their chief or some of their principal men, apply to the company's agent for transportation on one of its vessels to the well-known hunting grounds, and also for advances of provisions and clothing necessary for the hunt; that sometimes they wish to be landed near the hunting grounds selected, and hunt from the beach until such time as the vessel can return for them and take them to other grounds or back home; that until the last four or five years it was their custom to hunt from the beach, but since that time they usually remain on the vessel, sleep, cook their own food, and eat there, and go out from it in their bedarkes to hunt. He further testifies that the master of the schooner keeps an account against each Indian for all goods furnished; and for each skin brought in, and turned over to him for safe-keeping, he gives out a check or receipt, and at the end of the hunt, when the Indians leave the boat, they return these checks, and draw the skins which they represent. The natives can then sell these skins to any one who will give them the best price for them, as the company has no contract for their purchase, but they usually, though not always, sell them to its agent. But the company never hires or in any way engages them to hunt, and has no claim nor lien whatever on these skins. This witness and the master both testify that the natives who were on the Kodiak at the time of her seizure were there and were operating under the plan or arrangement as stated, and in no other way. This arrangement certainly accommodates the natives,

and no doubt enables them to make larger catches than they could without this assistance; but the company gets its benefits from the profits on goods sold and furs purchased, and, as it secures most of the trade, these profits probably pay it well for all trouble with the native hunting parties. And it is argued in its behalf that under the order of the secretary of the treasury, dated April 21, 1879, it had the right to do what the evidence shows it was doing. The portions of this order relied upon for this purpose read as follows: "No fur-bearing animals will, therefore, be allowed to be killed, by persons other than the natives, within the limits of Alaska territory, or in the waters thereof;" and, "No vessel will be allowed to anchor in the well-known otter-killing grounds, except those which may carry parties of natives to or from such killing grounds." There is no room for construction or verbal finesse in the first clause quoted. It excepts the natives from the general prohibition against all persons in section 1956, and is "the consent of the secretary of the treasury" that they may kill, under the restrictions of the order, such fur-bearing animals. And the second clause also seems plain enough. It amounts to a permit for vessels to carry natives to and from the otter-killing grounds, and, when so engaged, to anchor there. The Kodiak was doing nothing more than is permitted by this clause, unless allowing the natives to remain on board, to sleep and eat there, instead of landing them on the beach, and selling them food and clothing, constitutes a violation of the law. But in my opinion, these acts do not, of themselves, constitute, nor even import, a violation of the statute. They might, in connection with other evidence, tend to prove such violation. But in this case such other evidence, if any, is very slight. It follows from these views that the libel must be dismissed, and it is so ordered.