THE ALEXANDER.

UNITED STATES v. THE ALEXANDER.

(District Court, D. Alaska. February 6, 1894.)

1. FISHERIES—SEA OTTERS—ALASKAN WATERS—FORFEITURE.
   Rev. St. § 1956, prohibits the killing of fur-bearing animals within the limits of Alaska territory, "or in the waters thereof," and provides that

any vessel "engaged in violating this section" shall be forfeited. *Held*, that a vessel equipped for hunting sea otter, and cruising in Alaskan waters for that purpose, is "engaged in the violation" of this section, although the animals have to be captured by boats sent out, often to considerable distances from the vessel.

2. SAME—ALASKAN WATERS—LIMITS.

The schooner A. was seized and libeled for violating Rev. St. § 1956, which prohibits the capture of fur-bearing animals within the territory of Alaska, "or in the waters thereof." It was shown that she had made several captures of sea otter, and that her position, at all times, was within a line drawn from the southern end of Tugidak island to Chirikoff, thence in the direction of the mainland, through the Semidi group, on to Sutkwik island, and thence to the mainland; and that when within this line she was less than 12 miles from land. *Held*, that this was within the territorial waters of Alaska, and the schooner was liable to forfeiture under the said section.

In Admiralty. On final hearing. Libel by the United States against the schooner Alexander. Decree for libelant.

C. S. Johnson, U. S. Dist. Atty.
John S. Bugbee, for claimant.

TRUITT, District Judge. The libel of information in this case was duly filed July 11, 1893. It alleges that the schooner Alexander was seized, on or about the 2d day of July, 1893, at or near Chirikoff island, within the district of Alaska, by Capt. C. L. Hooper, commander of the United States revenue steamer Rush, and was then in proper custody at Sitka, Alaska. The cause of seizure, as set out in the libel, is as follows:

"That the said vessel, her master, officers, and crew, had been engaged in killing, and did on the 5th day of June, 1893, in latitude 56° 16' north, longitude 154° 24' west, near the south end of Tugidak island, kill two sea otters; and on the 13th day of June, 1893, in latitude 56° 45' north, longitude 154° 52' west, near Kadiak island, did kill one sea otter; and on the 25th day of June, 1893, in latitude 56° 12' north, longitude 156° 11' west, near Sutkwik and Afhgak islands, did kill six sea otters and one fur seal,—all of said animals having been unlawfully killed within the limits of Alaska territory, and in the waters thereof, in violation of section 1956 of the Revised Statutes and the regulations thereunder."

A decree of forfeiture is asked for in the usual terms. The Pacific Trading Company, a corporation under the laws of the state of California, intervening as bona fide owners of the Alexander, her boats, tackle, apparel, furniture, and cargo, filed an answer in the case on the 15th day of September, 1893. In this answer it is specifically denied that at the times alleged, or at any other time, the vessel, her master, officers, or crew, were engaged in killing, or did kill, any sea otter or fur seal at the places designated in the libel, and then makes a general denial of having killed any of such animals at any time or place within the limits of Alaska territory, or in the waters thereof, or within the admiralty or maritime jurisdiction of the United States. The killing of these animals is not denied by the answer, and on the trial the witnesses for claimant admitted that the hunters of the Alexander did kill the number of said animals named in the libel, on the respective dates therein alleged. These facts are also shown by the log book of the vessel,

which was put in evidence by the libelant. The main question, therefore, to be determined,· is whether the proofs show that the killing of these animals, or any of them, was a violation of section 1956, under the regulations of the secretary of the treasury. If any of them were killed within the "limits of Alaska territory or in the waters thereof," then the statute was violated, for it is not claimed that these hunters had any right or license to kill fur-bearing animals within such limits. If these limits were well defined, then the case would be a very simple one under the facts, and would turn wholly upon them. But they are not generally understood to be defined, or in any manner determined by competent authority, so far as they relate to Alaskan waters. Section 1956 of the Revised Statutes confers the power to authorize and regulate the killing of fur-bearing animals, except fur seals, within the limits of Alaska territory, or in the waters thereof, upon the secretary of the treasury, and said officer has at divers times issued written or printed regulations upon the subject. The regulations in force at the time the animals named in the libel were killed are contained in a circular duly issued by the secretary of the treasury under date of April 14, 1893, the direction and full text of which is as follows:

"To Collectors and Other Officers of the Customs, and to Officers of the Revenue Marine:

"Section 1956 of the Revised Statutes of the United States provides that no person shall, without the consent of the secretary of the treasury, kill any otter, mink, marten, sable, or fur seal, or other fur-bearing animals, within the limits of Alaska territory, or in the waters thereof, and that any person convicted of a violation of that section shall for each offense be fined not less than $200, nor more than $1,000, or be imprisoned not more than six months, or both; and that all vessels, with their tackle, apparel, furniture, and cargo, found engaged in violation of that section, shall be forfeited. No fur-bearing animal will be allowed to be killed by persons, other than natives, within the limits of Alaska territory, or in the waters thereof. The killing by any one of fur seals, except upon the Pribyloff islands, by such party or parties as are permitted so to do, pursuant to the terms of a contract between the government of the United States and such party or parties, is prohibited. White men married to natives, and residing within the territory, will not be entitled to the privilege of natives under this order. The use of nets by the natives in taking sea otter is hereby prohibited. The master of any vessel having on board skins of otter, mink, marten, sable, fur seal, or other fur-bearing animals taken in Alaska or Alaskan waters, before unlading the same, shall report to the collector of customs at the first port of arrival of such vessel in the United States, and shall file a manifest of such skins with said collector. Masters of vessels failing to comply with these regulations will be considered as having violated the provisions of section 1956 of the Revised Statutes, and will be liable to the penalties prescribed therein. It will be the duty of the officers of the United States who may be in the localities where sea otter, mink, marten, sable, or fur seal, or other fur-bearing animals are taken, or who may have knowledge of any such offense committed, to take all proper measures to enforce the penalties of the law against persons guilty of a violation thereof. These regulations supersede all others previously in force.        J. G. Carlisle, Secretary."

As I have already stated, the testimony of claimant's witnesses shows that the number and species of animals named in the libel were killed, by hunters belonging to the Alexander, on the dates therein alleged; and in fact the answer does not make an issue on these points, but it does deny that the animals were killed at the

respective places designated in the libel, and the evidence sustains the answer in this respect. It is not possible, from the evidence, to determine the exact point where any of said animals were actually taken, though the locality of the hunting was along the coast of Alaska, near Tugidak island, or between that island and Chirikoff island. The Alexander reached this locality on the 4th day of June, 1893, and her log book designates it as "the hunting ground." It appears that after arriving there, on the certain days named in the libel, the hunters, none of whom were natives of Alaska or Indians, went off from the vessel in boats used for that purpose, as soon as they could get away in the morning, and, after hunting for sea otter such time as seemed proper or advisable to them, returned to it with their catch in the afternoon or evening. The vessel, during that time, was either lying to, or kept headed in the direction the boats had taken, and allowed to beat or drift along slowly after them. The mate, who remained in charge of her, testified that the aim was to always keep in sight of the boats while they were out, but sometimes, in foggy or rough weather, they might, for a time, get out of sight. The bearings given in the libel to locate the respective points where fur-bearing animals were killed were taken from the log book. They are not where the animals were actually killed, but are the bearings of the schooner at 9 o'clock p. m. of the days named. None of the animals were killed nearer than five or six miles distant from these points, and perhaps even further away than that. As the mate, who was in a position to know, says he did not, from the schooner, see any of them killed, nor hear gunshots fired at them, they must have all been killed quite a distance away from it, though I do not think the boats went so far from it on these trips as the master estimates in his testimony, for he makes his estimate upon the supposition that the boats traveled three miles an hour while out hunting. I do not think they averaged that rate of speed. The mate gives it as his opinion that they traveled about two miles an hour, and this seems much nearer correct, as it is not reasonable that they would row along very fast while on the lookout for seals or otter. But, as I view the matter, these questions are of no material importance. I do not think the case turns upon the distance from the schooner to where the animals were killed, nor that it is necessary to prove the exact point or points in the water where such killing took place. Neither does it make any difference whether the boats were further out to sea than the schooner, or between it and the nearest land. A view of the case so narrow and technical would, in effect, make the statute a dead letter. It says, in defining the penalty so far as it relates to vessels: "All vessels, their tackle, apparel, furniture and cargo, found engaged in violation of this section shall be forfeited." Now, the question upon which this case turns is whether the Alexander was "engaged in violation" of this statute or not. Webster defines "engage" as: "To embark; to take a part; to devote attention and effort." It is admitted that the Alexander was engaged in sea-otter hunting. That was her business on the cruise. These ani-

mals are not usually killed from the deck of a schooner. To successfully hunt them it is necessary to send out the hunters in small boats or bidarkas, the latter always being used by the Aleuts. I think, where a vessel is out on a hunting voyage, her master, officers, and crew, or hunters on board, are all to be considered as engaged in a common enterprise or business, and every necessary action for the effectuation of the common purpose constitutes an essential part of the res gestae of any violation of law committed by any one of the party, and the vessel must be held responsible for such violation. If the Alexander was in Alaskan waters while the boats were out under control of her master, killing said animals, or received their catch while in such waters, then she violated the statute.

And just here we reach the pivotal question in the case: Was the Alexander within the waters of Alaska while engaged in hunting, or were the animals named in the libel, or any of them, taken therein? The evidence proves that none of them were killed within four leagues of the nearest shore, and even the points designated by the libel as the places where they were killed are more than that distance from land, except that of June 5th, which is about ten miles from Tugidak island. These places, however, as I have stated, are only the bearings of the schooner, taken at about 9 o'clock p. m. of the respective days mentioned, and are not where any otter or fur seal was actually killed. But I do not understand that this case is one that is to be tried and determined by the four-league rule. That rule is purely statutory, and relates only to the customs or revenue service. It does not attempt to extend the general maritime jurisdiction of the United States. This would involve an international question, and would disturb our friendly relations with other nations, unless done by mutual agreement and mutual concessions. The marine belt over which jurisdiction of the municipal laws of the adjacent land extend is generally understood and agreed upon among nations. It is determined by the law of nations, and the extent of such jurisdiction out over the open seas is three miles from shore, or what, at one time, was the range of a cannon shot. As that range is now extended to about twelve miles, some writers on international law claim that the marine belt ought to reach out that far. But, be this as it may, there have always been exceptions and modifications to this law. Even within this limit the waters are considered as a part of the common highway of nations, and the jurisdiction of the local authorities exists only for the protection of the coast and its inhabitants, not to subject passing vessels to the local laws of the government of the shore. On the other hand, nations at various times have asserted the right to protect their coasts from illicit trade, and prevent a violation of their laws by seizures on the high seas beyond the one-league zone. In Church v. Hubbart, 2 Cranch, 187, it is held that nations have this right, and that there is no fixed rule prescribing the distance from the coast within which seizures for violation of territorial laws must be made. In U. S. v. The James G. Swan, 50 Fed. 108, upon the question of jurisdiction raised therein, Judge Hanford says:

"National dominion and sovereignty may be extended over the sea as well as over the land. Should circumstances render it necessary, a nation having the power to do so may assert its dominion over the sea beyond the limits heretofore admitted by the powers of the earth to be lawful."

But in the case at bar I do not think it is necessary to invoke any unusual doctrine in order to give this court jurisdiction. It may be maintained by a fair construction of the statute, and by principles of law well established by judicial precedents. The object of the statute was and is to protect and prevent the destruction of fur-bearing animals in Alaska. The general facts of natural history are within the judicial cognizance of the courts. Lyon v. Marine, 5 C. C. A. 359, 55 Fed. 964. In the revised Encyclopaedia Britannica it is stated that:

"Sea otters are only found upon the rocky shores of certain parts of the North Pacific ocean, especially the Aleutian islands and Alaska; * * * but owing to the unremitting persecution to which they are subjected for the sake of their skins, which rank among the most valuable known to the furrier, their numbers are greatly diminishing, and unless some restriction can be placed upon their destruction, such as that which protects the fur seals of the Pribyloff islands, the species is threatened with extermination."

This authority shows that these animals are not accustomed to the open sea, but "are only found upon the rocky shores of certain parts of the North Pacific ocean." In the history of the fur trade in Alaska it appears that, when the business was first commenced, sea otters in large numbers were found along the coast from Bodega bay in California, all the way up to the northern islands of Alaska, and westward to the furthest part of the Aleutian range. They were only found in bays, inlets, and about the numerous islands along the coast; never far out in the open sea. So numerous were they in 1758 that Capt. Tolstykh, a Russian trader, secured over 5,000 skins on a single visit to Attoo island. Since that time they have been gradually disappearing, and their range becoming more limited, until now only a few, as compared with their former numbers, are left, and they are most all found about the islands, inlets, and banks along the Alaskan coast from Cook's inlet to the Semidi islands. This district is designated on the Alexander's log book as "the hunting ground," and has numerous islands within its limits. Sea otters are found between these islands, and between them and the mainland. The localities where they more commonly stay or resort are called "otter banks" by the hunters, and are designated as "otter-killing grounds" in treasury department circular of April 21, 1879. The master of the Alexander testified on this point, and his evidence is important in its bearing upon the habitat of this animal. He stated he had hunted sea otter in Japan and in Alaska, and that hunting them differed in the two countries in this: that in Japan they are hunted along the shore, while in Alaska they are hunted off shore. He was then asked to explain this difference in the manner of hunting, and his answer was: "There are banks in Alaska, and in Japan there are none where the otter keep themselves." The mate testified that the boats were out hunting on the occasion named, either between Tugidak and Chirikoff islands, or between these islands and the mainland. If, then, sea otters

along the Alaskan coast are off shore only because of the banks to which they resort, or because they are protected by the islands about and between which they are generally found, I think our laws should protect them, though they may, in such localities, be out more than three miles from the nearest land. The principle of contra bonos mores, suggested by Minister Phelps in the Bering sea controversy, might be urged to prevent foreign vessels from hunting sea otter in these waters, for it could hardly be considered good manners for them to do so. The Alexander belongs in the United States, and therefore no international question is involved in this case; but, unless the statute can be enforced against foreign vessels hunting in those otter grounds, it would be unjust and futile to enforce it against our own vessels. The case of The Kodiak, 53 Fed. 126, was a prosecution under the same section for the violation of which a forfeiture is sought in this case, and was tried in this court. The animals were killed about 20 miles from the nearest land, and it was contended by the claimant that the court had no jurisdiction to enforce the law beyond a marine league from the shore. The facts touching the question of jurisdiction in that case were similar to the facts in this, but jurisdiction was maintained. Among other reasons therefor, it is stated in the decision:

"If this position is correct, congress did a vain and useless thing when it enacted the statute under which this prosecution is had; for, from the nature and habits of the sea otter, if hunters are allowed to come with their vessels, and hover along the coast within a few miles of shore, though beyond a marine league therefrom, and kill them without molestation, then the laws for their protection are futile, and might as well be repealed. But the position is not correct."

The map or chart introduced in evidence, marked "Exhibit I," shows soundings and a chain of islands extending from Albatross bank along the coast, but far out from the shore of the mainland all the way down to the Shumagin bank, and inside of this chain, or of a line drawn from one of these banks to the other, the animals in question were killed. But the hunting grounds of the Alexander in this case may be included in much narrower limits, for if a line be drawn from the southern end of Tugidak island to Chirikoff, thence in the direction of the mainland through the Semidi group, on to Sutkwik island, and thence to the mainland, it will inclose the positions of the vessel on the days when these animals were taken, except that of the 5th of June, which is less than 12 miles from land. I think the evidence shows that such a line would inclose the hunting ground on which all of said animals were killed; and, from a fair construction of the law, I conclude they were taken in the territorial waters of Alaska, and within the jurisdiction of this court. The log book of the Alexander shows that on the 1st of July, 1893, she was on the hunting ground, and the testimony is that she was still there, and within one mile or less from Chirikoff island, on the 2d of said month, when seized, with hunters, guns, boats, and all appliances for sea-otter hunting, together with the skins of the animals previously killed, on board; and if it was necessary to decide the case upon a technical or limited construction of

the statute, I believe, from its language and the usual definition of the word, that she was "engaged" in violating the law at that time, but I prefer to base my decision upon the broader facts and principles already stated. A decree of forfeiture in accordance with the prayer of the libel must therefore be entered against the Alexander, her boats, tackle, apparel, furniture, and cargo.