68 U.S. 412
 17 L.Ed. 635
 1 Wall. 412
 UNITED STATES
v.
YORBA.
 December Term, 1863
 
 THIS was an appeal by the United States from the decree of the District Court for the Southern District of California.
 The respondent claimed a tract of land, called La Sierra, situated in the present county of Los Angeles, State of California; and in October, 1852, presented a petition to the Board of Commissioners, created by the act of March 3d, 1851, to ascertain and settle private land claims in California, asking for the confirmation of their title. In November, 1854, the board rejected his claim; but on appeal to the District Court the claim was, in December, 1856, adjudged valid, and confirmed to the extent of four square leagues. From this decree the appeal was taken.
 In support of his claim the respondent produced, from the archives of the former government, in the custody of the Surveyor-General of California, his petition to the governor for the land, the reference by him to the local authorities for information, and their reports on the subject; also, various proceedings had with reference to an adverse interest in the land, asserted by the widow of his deceased brother, and a draft or copy of the grant issued. He also produced the grant delivered to him, which was issued by Governor Pio Pico on the 15th of June, 1846. It is signed by the governor, and tested by his secretary of state; but neither the governor nor secretary were called to prove the execution of the grant. The genuineness of their signatures was proved by a third party, no objection being taken to its sufficiency at the time by the law agent of the United States, who was present at the examination of the witness.
 The grant was, apparently, much in the form common to these grants, except that it had not the usual requirements or conditions, requiring cultivation, inhabitancy, and the construction of a house within a year.[1]
 The respondent also proved that he had been for several years previous to receiving the grant in the occupation and use of the land in connection with his deceased brother.
 Mr. Wills, for the appellants: The United States object to the decree of confirmation in this case for several reasons:
 1. The grant is proved only by secondary evidence of the handwriting of the governor and his secretary, without any foundation having been laid for dispensing with the primary evidence.
 2. It is void, as against the United States, because made after May 13, 1846. No genuine or valid grants of lands in California were made by Mexican authority after May 13, 1846. This fact may be proved, first, by the admission of the Mexican government during the negotiation of the treaty of Guadalupe Hidalgo.
 The evidence on the subject is found in the diplomatic correspondence of our government in relation to the treaty.
 Mr. Buchanan, Secretary of State, in his letter of April 15, 1847, to Mr. Trist, our diplomatic agent, while transmitting him a draft of the proposed treaty of peace with Mexico, instructs him as follows:
 'The rights of the persons and property of the inhabitants of the territory over which the boundaries of the United States shall be extended will be amply protected by the Constitution and laws of the United States. An article, therefore, to secure those rights has not been inserted in the project; but should this be deemed necessary by the Mexican government, no strong objection exists against inserting in the treaty an article similar to the third article of the Louisiana treaty. It might read as follows: 'The inhabitants of the territory over which the jurisdiction of the United States has been extended by the fourth article of this treaty shall be incorporated into the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess.' In the event of the insertion of this article, it would be proper to add to it the following: 'Provided, That all grants or concessions whatever of any lands made or issued by the Mexican government since the thirteenth day of May, one thousand eight hundred and forty-six, within the said territory, shall be absolutely null and void.' The date might, if necessary, be changed from the day when Congress recognized the existence of the war to the month of September, 1846, when the American forces took possession of California.'[2]
 Mr. Trist, in his letter of January 25, 1848, to the Secretary of State, transmitting the treaty of peace negotiated by him, on the point in question, says:
 'With respect to grants of land made by the Mexican authorities, the proviso contained in my instructions was strenuously objected to upon a point of national honor and decorum. No such grants had been made since the 13th May, 1846. This they knew, and consequently the proviso could have no practical effect. But it implied that they had been made, or might have been made, and that, nevertheless, the government committed the injustice of revoking them; which, in fact, it had authority to do. Moreover, it involved an acknowledgment that, from the day when hostilities broke out on the north of the Rio Bravo, the Mexican government had lost the right to make grants of land in any part of its territory subsequently occupied by us. Feeling the force of these objections, I requested to make sure of the fact stated by them; and also in regard to no grants having been made in Texas since the revolution, which had been incidentally mentioned by one of them (the Mexican negotiators). And this having been done, in a manner which left no shade of doubt on their minds, the declaration which will be found at the end of ART. 10 was agreed upon, in lieu of the proviso.'[3]
 That declaration is in these words:
 'The Mexican government declares that no grant whatever of lands in Texas has been made since the second day of March, one thousand eight hundred and thirty-six; and that no grant whatever of land, in any of the territories aforesaid, has been made since the thirteenth day of May, one thousand eight hundred and forty-six.'[4]
 This declaration of the fact in question is the more valuable from the circumstance that while Mexico was unwilling to stipulate that all grants of land in California made after May 13, 1846, should be null and void, it was nevertheless willing to declare, and did declare the fact, that no such grants had been made. It is also entitled to credit because made by the party most interested in knowing, after examination, with the best sources of information within its reach, and with opportunity, during a period of nearly two years, to ascertain the truth of the fact.
 But it may be objected that the tenth article of the treaty, which contained this declaration, was rejected by the Senate of the United States, and that, therefore, it is inoperative in a question of this kind. This objection misconceives the argument. If the invalidity of all grants of land in California made after May 13th, 1846, was urged on the ground of a treaty stipulation to that effect, the objection now made would be unanswerable. But it is not placed on that ground. Mexico was not willing to place it on that ground; neither are we. We place it on the ground of the fact, attested by Mexico herself. The rejection of the article of the treaty containing this statement of fact is, therefore, immaterial The fact still remains unchanged in all its original force, and with all its original consequences. Doubt on this point is dispelled when we learn the reason why the tenth article of the treaty was rejected. To the first clause of the first paragraph of the tenth article there was no objection. It simply declared the doctrine of international law in cases of the cession of territory, and was afterwards embodied in the treaty in another form. To the last paragraph containing the declaration quoted there could be, and there was, no objection on the part of the United States, because it was for their benefit, and was inserted, as we have seen, at the instance of our Secretary of State. The objection to the article, as a whole, was to another part of it, which stipulated for an extension of time in favor of the grantees of land in Texas, California, and New Mexico, under grants previously made, for the performance of the conditions contained therein, to take effect from the exchange of the ratifications of the treaty.
 This we know from a variety of sources.
 I. From the message of the President of the United States, submitting the treaty to the Senate, in which he recommends the rejection of the tenth article of the treaty for the reason already stated. 'To the tenth article of the treaty,' says he, 'there are serious objections, and no instructions given to Mr. Trist contemplated or authorized its insertion. The public lands within the limits of Texas belong to that State, and this government has no power to dispose of them, or to change the conditions of grants already made. All valid titles to land within the other territories ceded to the United States will remain unaffected by the change of sovereignty; and I therefore submit that this article should not be ratified as a part of the treaty.'[5]
 II. We know it from the letter of the Secretary of State of March 18, 1848, to the Mexican Minister of Foreign Relations, explaining the causes of the amendments to the treaty made by the Senate, and, among others, the rejection of the tenth article. Thus it reads:
 'The third amendment of the Senate strikes from the treaty the tenth article. It is truly unaccountable how this article should have found a place in the treaty. That portion of it in regard to lands in Texas did not receive a single vote in the Senate. If it were adopted it would be a mere nullity on the face of the treaty, and the judges of our courts would be compelled to disregard it. It is our glory that no human power exists in this country which can deprive one individual of his property without his consent, and transfer it to another. If grantees of land in Texas, under the Mexican government, possess valid titles, they can maintain their claims before our courts of justice. If they have forfeited their grants by not complying with the conditions on which they were made, it is beyond the power of this government, in any mode of action, to render those titles valid, either against Texas, or any individual proprietor. To resuscitate such grants, and to allow the grantees the same period after the exchange of the ratifications of this treaty to which they were originally entitled, for the purpose of performing the conditions on which these grants had been made, even if this could be accomplished by the power of the government of the United States, would work manifold injustice. These Mexican grants, it is understood, cover nearly the whole of the sea-coast and a large portion of the interior of Texas. They embrace thriving villages, and a great number of cultivated farms, the proprietors of which have acquired them honestly by purchase from the State of Texas. These proprietors are now dwelling in peace and security. To revive dead titles, and suffer the inhabitants of Texas to be ejected under them from their possessions, would be an act of flagrant injustice, if not wanton cruelty. Fortunately, this government possesses no power to adopt such a proceeding. The same observations equally apply to such grantees in New Mexico and Upper California. The present treaty provides amply and specifically in its eighth and ninth articles for the security of property of every kind belonging to Mexicans, whether held under Mexican grants or otherwise, in the acquired territory. The property of foreigners, under our Constitution and laws, will be equally secure without any treaty stipulation. The tenth article could have no effect on such grantees as have forfeited their claims but that of involving them in endless litigation, under the vain hope that a treaty might cure the defects in their titles against honest purchasers and owners of the soil. And here it may be worthy of observation, that if no stipulations whatever were contained in the treaty to secure to the Mexican inhabitants, and all others, protection in the free enjoyment of their liberty, property, and the religion which they profess, these would be amply guaranteed by the Constitution and laws of the United States. These invaluable blessings, under our forms of government, do not result from treaty stipulations, but from the very nature and character of our institutions.'[6]
 The declaration of fact contained in the last paragraph of that article remains, therefore, unaffected by its rejection as a part of that article.
 The general fact for which we contend is further proved by the second admission of the fact by the Mexican government, in the protocol signed by its ministers before the exchange of the ratifications of the treaty of Guadalupe Hidalgo. After reciting the appointment of commissioners of the United States, with full powers to make to the Mexican republic suitable explanations in regard to the amendment of that treaty made by the Senate and government of the United States, that document declares that
 'It was agreed, after adequate conversation respecting the changes alluded to, to record in the present protocol the following explanations, which their aforesaid excellencies, the commissioners, gave in the name of their government, and in fulfilment of the commission conferred upon them near the Mexican republic.'
 '2d. The American government, by suppressing the tenth article of the treaty of Guadalupe, did not in any way intend to annul the grants of land made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the article of the treaty, preserve the legal value which they may possess; and the grantees may cause their legitimate titles to be acknowledged before the American tribunals. Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico, up to the 13th of May, 1846, and in Texas up to the 2d of March, 1836. And these explanations having been accepted by the Minister of Foreign Affairs of the Mexican republic, he declared, in the name of his government, that, with the understanding conveyed by them, the said government would proceed to ratify the treaty of Guadalupe as modified by the Senate and government of the United States.'[7]
 It will be observed that the solicitude of the Mexican government, so far as concerns land grants in California, relates to those made prior to May 13th, 1846. Having previously declared to our government that no grants of lands in California had been made after that date, in exacting an explanation from our government as a preliminary condition to the exchange of the ratifications of the treaty, it only required our commissioners to recognize and declare as 'legitimate' 'those titles which were legitimate under the Mexican law in California up to the 13th of May, 1846.' No pledge was exacted in regard to grants made after that date, and for the obvious reason that Mexico had previously declared that none had been made. The explanation and definition of 'legitimate titles' in California thus required by Mexico from the United States on the basis of its own previous statement is, therefore, equivalent to a redeclaration of that fact by Mexico. That declaration, therefore, is the measure of the obligations of the United States under the treaty in regard to land grants in California. We are not bound to recognize as genuine or valid any grants made or purporting to be made after May 13, 1846. This result follows, not directly, from any treaty stipulation to that effect, but indirectly, from the declaration of a fact by Mexico, which fact thus becomes the measure of our obligations under the treaty. No injustice, no want of good faith, can be imputed to us for executing the treaty on the basis of the general fact affirmed and reaffirmed by Mexico to the government of the United States, viz.: that no genuine or valid grants of land in California were made after May 13, 1846.
 This fact is also confirmed by the journal of the Departmental Assembly for the year 1846, found among the archives of California. An examination of that document shows that it extends from March 2, 1846, to July 24, 1846; and that in the sessions held from May 13, 1846, to July 24, 1846, no grant was presented by the governor, for approval by the Assembly, dated later than May 2, 1846, although sessions were held successively May 15, June 3, June 10, June 15, July 1, July 3, July 6, July 7, July 8, and July 24, 1846.[8]
 This result, it will be seen, is in harmony with the declaration made by Mexico to the United States on the subject of land grants in California, after examination.
 3. But admitting the competency of the governor to make the grant after May 13, 1846, the grant is illegal, because it does not contain the usual conditions, requiring building within a year, cultivation, and inhabitancy. By the regulations of 1828, 'the governors of the territories are authorized (in compliance with the law of the General Congress of the 18th of August, 1824, and under the conditions hereafter specified) to grant vacant lands in their respective territories to such contractors, families, or private persons, whether Mexicans or foreigners, who may ask for them for the purpose of cultivating and inhabiting them.'[9] The governor, therefore, had no authority to grant lands, except upon conditions for the purposes of cultivation and inhabitancy, which he did not do.
 Mr. Justice FIELD delivered the opinion of the court:
 
 
 1
 Three objections are urged by the appellants to the decree of confirmation.
 
 
 2
 1st. That the grant to the claimant was proved by secondary evidence.
 
 
 3
 2d. That the grant was issued by the Mexican governor of California, after the 13th of May, 1846; and
 
 
 4
 3d. That the grant does not contain conditions requiring cultivation and inhabitancy and the construction of a house within a year.
 
 
 5
 1. The first objection rests upon the fact that the governor who signed and the secretary who attested the grant were not called to prove its execution, and that the instrument was admitted upon proof of their signatures. This proof of their signatures by a third party is characterized by counsel as secondary evidence of the execution. Whether with strict accuracy it can be thus characterized is immaterial. Their testimony, or at least testimony establishing something more than the genuineness of their signatures, might have been required, if the usual preliminary proceedings to the issue of a Mexican grant in colonization had not been produced in the case from the archives of the former government in the custody of the Surveyor-General of California. In the absence of the preliminary proceedings, suspicion naturally arises as to the genuineness of any grant produced, and in such cases the strict proof mentioned in United States v. Teschmaker,[10] and in Fuentes v. United States,[11] may be demanded. But where the preliminary proceedings are preserved in the archives, and no doubts in consequence are created as to the genuineness and due execution of the grant, the proof of the signatures of the grantor and attesting secretary will, on appeal, be deemed sufficient by this court, unless objection is taken to its sufficiency in the first instance before one of the inferior tribunals. Such is the purport of the recent decision in the case of The United States v. Auguisola.[12]
 
 
 6
 2. The invalidity of grants issued by the Mexican governors of California, after the 13th of May, 1846, is asserted upon the declaration of Mexico, through her commissioners, who negotiated the treaty of Guadalupe Hidalgo, that no such grants were issued subesquent to that date. It is true that such declaration was made and embodied in the projet of the treaty originally submitted to our government. But as the clause containing it was stricken out by the Senate, it cannot be affirmed that the treaty was assented to by the United States on the faith of the declaration. Even if the case were different, and the treaty had been concluded in reliance upon the truth of the declaration, that fact could not affect the rights of parties, who, subsequent to the 13th of May, 1846, obtained grants from the governors of California, whilst their authority and jurisdiction in the country continued. The rights asserted by the inhabitants of the territory to their property depend upon the concessions made by the officers of the former government having at the time the requisite authority to alienate the public domain, and not upon any subsequent declaration of Mexican commissioners on the subject.
 
 
 7
 The authority and jurisdiction of Mexican officials are regarded as terminating on the 7th of July, 1846; on that day the forces of the United States took possession of Monterey, an important town in California, and within a few weeks afterwards occupied the principal portions of the country, and the military occupation continued until the treaty of peace. The political department of the government at least appears to have designated that day as the period when the conquest of California was completed, and the Mexican officials were displaced; and in this respect the judiciary follows the action of the political department.[13]
 
 
 8
 3. The absence from the grant of conditions requiring cultivation and inhabitancy, and the construction of a house within a year, does not affect the validity of the grant. The omission to insert them probably arose from the fact that the grantee, together with his deceased brother, had been for years previous in the occupation and use of the premises. The object of the general colonization law of 1824, and the regulations of 1828, which were adopted to carry that law into effect, was the settlement of the vacant lands of the Republic, and to secure that object concessions like the one in this case were generally made subject to the conditions of cultivation and inhabitancy, although the conditions were not always inserted in the title papers. It would be unnecessary to insert them when such cultivation and inhabitancy by the grantee already existed. In the grant to Sutter, the validity of which was affirmed by this court,[14] there was a similar omission, and no doubt for like reasons.
 
 
 9
 DECREE AFFIRMED.
 
 
 
 [1]
 Its exact form, translated, was as follows:
 PIO PICO, CONSTITUTIONAL GOVERNOR OF THE DEPARTMENT OF THE CALIFORNIAS:
 Whereas, the citizen Bernardo Yorba has asked, for his personal benefit and that of his family, a piece of land which for many years he has legally possessed, called the Sierra, on the banks of the River Santa Ana, bounded by the said river and the rancho of Temiscal, the proper proceedings having been taken and inquiries made, in the exercise of the powers which are conferred upon me, in the name of the Mexican nation, I have, by a decree of this day, granted him the said land, declaring it his property by these presents, in conformity to the law of the 18th of August, 1824, and the regulation of the 21st of November, 1828, subject to the approval of the Departmental Assembly, and under the following conditions:
 1st. He shall have power to inclose it, without injury to the crossings, roads, and servitudes; he shall enjoy it freely and exclusively, applying it to the use and cultivation which may best suit him.
 2d. He shall solicit the proper judge to give him the judicial possession in virtue of this decree, by whom the boundaries shall be marked with the necessary monuments.
 3d. The land of which donation is made is four leagues 'de ganado mayor.'
 The judge who shall give the possession shall have it measured in conformity to the ordinance, leaving the surplus, if any remains, to the nation, for the purposes for which it may be required.
 Wherefore I order that this title, being held firm and valid, be recorded in the proper book, and be delivered to the party interested for his security, and other purposes.
 Given in the city of Los Angeles, on this common paper, for want of sealed, the 15th of June, 1846.
 PIO PICO.
 JOSE MATIAS MORENO, Sec'y ad int.
 This superior decree is recorded in the proper book, dated as above.
 MORENO.
 
 
 [2]
 Senate Doc., 1 Sess. 30 Cong., vol. 7, for 1847-48, No. 52, p. 83.
 
 
 [3]
 Ib., p. 292.
 
 
 [4]
 Ib., p. 50.
 
 
 [5]
 Message of Feb. 22d, 1848, Ib., p. 34.
 
 
 [6]
 Senate Doc., 30 Cong., vol. 7, for 1847-48, No. 60, pp. 69, 70. To the same effect, see also the President's message of February 8, 1849, to the House of Representatives, communicating the protocol signed at the exchange of the ratifications of the treaty, with the accompanying documents. (Ex. Doc., 2d sess. 30th Cong., 1848-49, vol. 5, No. 50, pp. 7, 8.) Mr. Buchanan's letter to Mr. Sevier, of March 18, 1848. (Ib., pp. 47, 48.) Debate in the Senate on the protocol, February 10, 1849. Remarks of Senators Rusk, Bradbury, and others. (Cong. Globe and Appendix, vol. 20, 2d sess. 30th Cong., pp. 500-502.)-
 
 
 [7]
 Ex. Doc., 2d sess. 30th Cong., 1848-49, vol. 5, No. 50, pp. 77, 78.
 
 
 [8]
 See 'Record of Sessions of the Departmental Assembly' for 1846, appendix to appellant's brief in United States v. Bolton, pp. 221 to 253.
 
 
 [9]
 Halleck's Report, appendix No. 5, § 1.
 
 
 [10]
 22 Howard, 392.
 
 
 [11]
 Id., 443.
 
 
 [12]
 Ante, p. 352.
 
 
 [13]
 See United States v. Pico, 23 Howard, 326.
 
 
 [14]
 21 Id., 170.