UNITED STATES et al. v. ALASKA PACKERS' ASS'N et al.

(Circuit Court, D. Washington, N. D. March 12, 1897.)

1. CONSTRUCTION OF INDIAN TREATY.

Article 5 of the treaty of January 22, 1855, with the several Indian tribes of Washington Territory (12 Stat. 928), which provides that "the right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the territory, and of erecting

temporary houses for the purpose of curing," was not intended to secure to the Indians exclusive rights at any particular places, but only such rights as might be enjoyed by all citizens in common, and valid state laws effective to abridge the fishing rights of citizens are equally effective as against the Indians.

2. RIGHT OF NATIONAL GOVERNMENT TO DISPOSE OF INDIAN RESERVATIONS.

The national government, as original proprietor, has the power to dispose of public lands even within an Indian reservation without the consent of the Indians; and even if the Indian treaty of January 22, 1855 (12 Stat. 928), be regarded as making a reservation of fishing grounds and lands adjacent necessary for use of the Indians, congress still had the power to make disposition of the same grounds, notwithstanding the treaty.

3. STATE CONTROL OF FISHERIES.

In the control of fisheries within a state, the state government is supreme.

W. H. Brinker and J. A. Kerr, for plaintiffs.

S. H. Piles and Dorr, Hadley & Hadley, for defendants.

HANFORD, District Judge. This is a suit by the United States and certain Indians of the Lummi tribe for an injunction against the Alaska Packers' Association, a corporation, and Kate Waller, to protect the Lummi Indians in the right to take salmon, by their ancient and primitive means of fishing, in the waters adjacent to Point Roberts, and to maintain summer houses for their habitation, and places for drying fish on the shore during each fishing season, which rights are alleged to be guarantied by article 5 of a treaty made and concluded at Point Elliott, Wash. T., January 22, 1855 (12 Stat. 928), which article reads as follows:

"Art. 5. The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands: provided, however, that they shall not take shell fish from any beds staked or cultivated by citizens."

Point Roberts is the extremity of a peninsula extending into the Gulf of Georgia, and stands as a headland of Semiahmoo Bay. The boundary line between the state of Washington and British Columbia crosses Semiahmoo Bay and the peninsula so that only the extreme outer end of the peninsula south of the boundary line belongs to the United States. This small area of land, projecting from British territory into deep water, was at one time, by an order of the president, reserved for governmental use; but the defendant Kate Waller has been permitted to acquire title to a part of the same, under the homestead law of the United States, and she is at present the owner of the particular land which the Indians wish to occupy. The defendant the Alaska Packers' Association owns a fishing establishment and cannery on land leased from Mrs. Waller, and has in connection therewith a wharf, and has constructed a number of leads and fish traps in adjacent waters. The traps consist of rows of piles supporting nets forming barriers in the way of salmon migrating towards the Fraser river, and operating so as to lead the salmon into traps. There is a reef over which the Sockeye salmon have been accustomed to run in great numbers in making their way towards the Fraser river. The Indians, taking ad-

vantage of the shoal water over this reef, have been accustomed to catch fish there by the use of nets made of willow bark.

The bill of complaint charges that, at and prior to the time of making the treaty above referred to, this reef, near Point Roberts, was one of the usual places for taking fish, or fishing stations, to which the Lummi Indians had been accustomed to resort for the purpose of obtaining fish for food; and that they were accustomed to erect and maintain temporary houses, in which to live during the fishing season, upon the shores adjacent to said reef; and that the fish traps above described, constructed and maintained by the Alaska Packers' Association, are so placed as to completely obstruct the run of the Sockeye salmon towards and over the said reef, so that while said traps continue to exist, without openings therein for the passage of fish, the Indians are prevented from catching fish upon or over said reef; and that they are unable, with their means of taking fish, to catch the Sockeye salmon at any other place. The Sockeye is a species of salmon especially valuable for canning, on account of the red color of the flesh. They run during a period of only from 20 to 40 days each year, commencing about the 1st of July. Other varieties, equally good for the use of the Indians, are obtained in the same waters in the spring and fall of each year. The Lummi Indians, in whose behalf this suit has been commenced, have had the lands upon their reservations allotted to them in severalty, and patented. They all have cultivated farms, and are an unusually thrifty and enterprising tribe of Indians.

It is a disputed point in the case whether or not the Lummi Indians were, at or previous to the time of the treaty, accustomed to resort to the Point Roberts fishing station to catch fish. I consider this an immaterial point, for, as I construe the treaty, the fifth article was not intended to create a reservation of any particular place for catching fish, in favor of any one of the different tribes or bands of Indians with whom the treaty was made. It is a general provision in favor of all the Indians represented by signers of the treaty, and applies generally to all fishing stations within the territory of Washington; and the words used, so far from creating an exclusive right, manifest clearly a purpose to secure equality of rights in favor of the Indians, at all usual places where citizens have the common right of fishing. Although I regard the point as immaterial, I will say that I find a decided preponderance of the evidence in favor of the contention on the part of the complainants, and the evidence satisfies me that for many generations the Lummi Indians have been accustomed to catch fish, by means of nets of their own manufacture, at the place referred to.

The legislature of the state of Washington has assumed to make laws regulating the construction of fish traps, and authorizing the issuance of licenses for the construction, maintenance, and operation of fish traps, and appliances for catching salmon. Laws Wash. 1893, p. 15; State v. Crawford, 13 Wash. 633, 43 Pac. 892. The Alaska Packers' Association claims the right to maintain its fish traps by virtue of licenses therefor, duly issued, pursuant to the laws of the state, and avers that the same have been constructed in conformity with the regulations prescribed by the state; and this defense is fully sus-

tained by the evidence.    The case therefore presents a controversy between the Indians claiming rights guarantied by a treaty made with the national government, and a corporation claiming rights conferred by the laws of the state; and it becomes necessary to determine, in the first place, the validity of these conflicting claims, by an interpretation of the treaty, and. in the second place, whether the fish traps, as constructed and maintained, do infringe the lawful rights of the Indians, and, if so, which of the contending parties has the paramount right.    The object of the government in making the treaty was to extinguish the Indians' title to lands in Washington Territory, so that the same might be opened for settlement and improvement by white people, to define the boundaries of the reservations for the exclusive use and occupancy of the different tribes respectively, and to agree with the Indians as to their compensation for the lands ceded, and to establish peace and friendly relations with the Indians.    Having in view the general scope and object of the treaty, and the particular provisions contained in the different articles, I am unable to find any indication of an intent, in the fifth article, to create, in favor of the Indians, reservations of any particular places for fishing purposes, or sites for their habitations, or as places for drying fish.    As I have already intimated, the words of this article indicate a purpose to secure to the Indians equality of rights, co-equal with the rights of citizens, and not exclusive rights at any particular places.    Instead of reserving places for permanent use for curing fish, the article secures to the Indians only a right to erect temporary houses for the purpose of curing, and that right is coupled with the privilege of hunting and gathering roots and berries on open and unclaimed lands.    Now, as the government contemplated the settlement of Washington Territory, and the acquisition of titles to the public lands by individuals under the general laws providing for the conveyance by the United States of titles in fee simple, it is unreasonable to suppose that article 5 was intended to reserve, from sale and disposition by the government, any particular tracts not particularly described, and not included within the reservations which are described in the treaty; and it is equally unreasonable to suppose that all the public lands in Washington Territory adjacent to waters where fish may be taken are, by the fifth article of the treaty, permanently impressed with an easement in favor of the Indians.    I conclude, therefore, that the rights guarantied by the fifth article are only such as might be, after the date of the treaty, enjoyed by all citizens in common, and valid laws effective to abridge the fishing rights of citizens are equally effective as against the Indians.    In decisions heretofore rendered, both for and against the government, I have given the same interpretation to similar treaties with other tribes of Indians in Washington Territory.    U. S. v. The James G. Swan. 50 Fed. 108: U. S. v. Winans, 73 Fed. 72.    Up to the present time these decisions stand unreversed.

To construct permanent fish traps and fixed appliances in such a manner as to wholly deprive the Indians of any chance to take fish for their own use at any usual or accustomed fishing place, as the bill of complaint in this case charges that the Alaska Packers' Association has done, would certainly be an infringement of the rights

guarantied to the Indians by the treaty. But the answer raises an issue as to whether or not the fish traps in question do constitute such an interference as the bill charges. I find from the evidence bearing upon this disputed question that, since the fish traps now owned by the Alaska Packers' Association were put in place, the Indians have been successful as fishermen in the vicinity of Point Roberts during all seasons when the different varieties of salmon are running, and have obtained an abundance for their own use, and a surplus of thousands of fish, which they have been able to sell to the canneries at a good price. To interfere with the Alaska Packers' Association in such a way as to render its business unprofitable, and drive it away from Point Roberts, would be a serious injury, rather than benefit, to the Indians, for they would then be obliged to sell their fish elsewhere; and, by removal of this competitor, the market would be affected to the injury of those engaged in catching fish for sale, including these same Indians, who are joined as complainants with the United States in this case. The testimony fails to convince me that these Indians are unable to make use of appliances or means for taking fish other than nets of inferior quality, such as they were able to manufacture previous to the coming of white people to this country. On the contrary, it is shown that they are able to obtain and use better material for fish nets, and that they are able to operate in deep water, and that, notwithstanding the fish traps complained of, there is still ample room for them to engage in fishing, and that they can do so successfully in all seasons.

Conceding that the fish traps complained of do impede the fishing operations of the Indians, to the extent of restricting them in the choice of means for taking fish, or even to the extent of depriving them of the choice of locations upon the fishing grounds, by obstructing the fish from running to the places where they have formerly been accustomed to anchor their nets, still it must be considered that the fish traps as constructed are authorized and licensed by the state government, pursuant to laws enacted for the purpose of regulating fisheries within the state. The treaties made with the several Indian tribes are not to be regarded as conveyances of the title to lands within Washington Territory, from the Indians as proprietors, with limitations and reservations of easements. The government of the United States does not deraign title to its public lands from the Indians. The national government is the primary source of title, and, as original proprietor, it had the power to dispose of public lands, even within an Indian reservation, without the consent of the Indians. Johnson v. McIntosh, 8 Wheat. 543–604; U. S. v. Cook, 19 Wall. 591–597.

In the opinion of the supreme court, by Mr. Justice White, in the case of Spalding v. Chandler, 160 U. S. 394–407, 16 Sup. Ct. 360, the doctrine held by the supreme court is stated as follows:

"It has been settled by repeated adjudications of this court that the fee of the lands in this country in the original occupation of the Indian tribes was, from the time of the formation of this government, vested in the United States. The Indian title, as against the United States, was merely a title and right

to the perpetual occupancy of the land, with the privilege of using it in such mode as they saw fit, until such right of occupation had been surrendered to the government. When Indian reservations were created, either by treaty or executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated."

Even if the treaty should be regarded as making a reservation of fishing grounds and lands adjacent, necessary for use of the Indians, congress still had the power to make other disposition of the same grounds, notwithstanding the treaty. The supreme court, in the same opinion, referring to the power of congress to control the use of lands within an Indian reservation, or dispose of the same, held that:

"The power existed in congress to invade the sanctity of the reservation, and disregard the guaranty contained in the treaty of 1820, even against the consent of the Indians, party to that treaty; and, as the requirement of the grant necessarily demanded the possession of the portion of the reserve through which the canal was to pass, the effect of that act was to extinguish so much of the Indian reserve as was embraced in the grant to the state for canal purposes."

Applying the same rules to the case in hand, we find that, pursuant to laws enacted by congress, an absolute title in fee simple has been conveyed by the United States government to the land whereon the Indians claim a right to erect temporary houses, for their use during the fishing seasons, to the defendant Kate Waller; and by the enabling act, pursuant to which the territory of Washington has been admitted into the union of states on an equality with the original states, and the constitution adopted by the state, all proprietary rights in the waters within the boundaries of the new state, and the power to regulate and control rights of fishery in those waters, have been transferred to, and assumed by, the state of Washington. By article 17 of its constitution, the people of this state have made the following claim of dominion over its public waters:

"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

It is settled by the decisions of the supreme court that, under the provisions of our federal constitution, the same rights and powers possessed by the original 13 states in all things relating to the public waters within their boundaries must be conceded to each new state admitted into the Union, because essential to make each of the states co-equal with the others. Pollard v. Hagan, 3 How. 212–235; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548. And it has also been determined by the supreme court that each state has the right and power of a proprietor and sovereign to control, regulate, restrict, and license the enjoyment by individuals of the privilege of taking fish from its public waters. McCready v. Virginia, 94 U. S. 391–397; Manchester v. Massachusetts, 139 U. S. 240–266, 11 Sup. Ct. 559. In the latter case the supreme court affirmed a judg-

ment i...posing a fine for fishing in Buzzard Bay, contrary to the laws of Massachusetts, in a vessel licensed for the fishing trade, pursuant to the laws of the United States, placing the decision upon the ground that, in the control of fisheries within the state, the state government is supreme.

These considerations lead me to conclude: (1) That the rights of the Lummi Indians under the treaty referred to have not been invaded by the defendants in such manner as to call for legal redress. (2) That it is not competent for this court to interfere by an injunction with the fish traps of the Alaska Packers' Association, which are authorized and licensed by the laws of the state. Let there be a decree dismissing the suit, without costs.