## UNITED STATES v. HOLT.

(Circuit Court, W. D. Washington, N. D.   March 4, 1909.)

No. 1,682.

1. CRIMINAL LAW (§ 957*) — MOTIONS FOR NEW TRIAL OR IN ARREST OF JUDGMENT—TESTIMONY OF JURORS.

Where the jurors on the trial of a criminal case on each adjournment were properly admonished against receiving outside impressions of the case, and there is no reason to suppose they failed to observe these instructions, the court will not, on motion of a defendant after conviction, institute an inquisition against them by bringing them into court to be examined for the purpose of eliciting facts to impeach their verdict.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2392; Dec. Dig. § 957.*]

2. CRIMINAL LAW (§ 970*)—GROUNDS FOR ARREST OF JUDGMENT—EVIDENCE BEFORE GRAND JURY.

The fact that incompetent evidence which was excluded on the trial of a criminal case may have been considered by the grand jury, which found the indictment, is not ground for arrest of judgment on a verdict of guilty which is amply supported by competent evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2445; Dec. Dig. § 970.*]

3. CONSTITUTIONAL LAW (§ 72*)—JUDICIAL POWERS—ENCROACHMENT ON EXECUTIVE.

The validity of the title of the United States to land purchased and occupied by it as a military fort, and the identification and definite boundaries of the land, are matters within the scope of the powers and duties of the executive department of the government to determine, and not subject to judicial scrutiny on the trial of a criminal case.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 133; Dec. Dig. § 72.*]

4. UNITED STATES (§ 3*)—JURISDICTION—PLACES ACQUIRED FOR MILITARY PURPOSES.

Article 1, § 8, of the Constitution vests in the national government exclusive jurisdiction over places occupied and used for military purposes, when the site has been acquired with the consent of the Legislature of the state in which it is situated.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 3; Dec. Dig. § 3.*]

5. CRIMINAL LAW (§§ 853, 854*)—CONDUCT OF TRIAL—SEPARATION OF JURORS—PRESENCE DURING PROCEEDINGS.

The verdict of a jury in a criminal case in a federal court cannot be impeached on the ground that the court, in accordance with its settled practice, permitted the jurors to separate during adjournments and recesses while the trial was proceeding, or refused to exclude the jurors from the courtroom during the argument and decision of motions and questions of law.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2040; Dec. Dig. §§ 853, 854.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Criminal Law. Case heard on motions after a verdict finding the defendant guilty of murder. Motions denied.

Elmer E. Todd, U. S. Dist. Atty.

Caldwell & Riddell, for defendant.

HANFORD, District Judge. The defendant, having been indicted for the crime of murder committed at the Ft. Worden military post, after a motion to quash the indictment had been denied and a demurrer had been overruled, entered a plea of "not guilty," and after a trial the jury returned a verdict finding him guilty as charged, "without capital punishment." His counsel have interposed in his behalf three motions, viz.: A motion to summon the jurors for examination in open court for the purpose of eliciting facts impeaching the verdict; a motion in arrest of judgment; a motion for a new trial.

The first of the three motions is upon the ground that the trial was prolonged through a number of days, and at each adjournment and recess of the court, previous to the final submission of the case to the jury, the jurors were permitted to separate, and they were free to read, and did read, the daily newspapers in which the case was referred to and commented upon, in a manner prejudicial to the defendant's case. An affidavit in support of the motion alleges that, several days after the verdict had been returned, one of the jurors admitted having had a conversation at his home with a hired man, in which the trial was mentioned. The juror referred to has made a counteraffidavit explaining that the conversation with his hired man was had after the verdict had been returned, and alleging that during the time the case was on trial he did not have any conversation with any person whomsoever in which the case was mentioned.

It is the opinion of the court that the defendant has had a fair trial by a jury composed of fair-minded, intelligent, honest men, and it will not be presumed that they were influenced, in making their decision, by the newspapers. Previous to the arguments made to the jury, the court cited one of the reporters, and in the presence of the jury interrogated him concerning a published article referring to the case, which the jurors necessarily knew was inaccurate, and elicited from him an admission that he was the author of it, and that he had been misinformed in regard to some of the facts; and thereupon the court admonished and advised the jurors to be careful to not give heed to unreliable statements published by the papers, and on each occasion of adjournment the court admonished the jurors to refrain from talking about the case or any subject connected with it, either with each other or with any person, and to not listen to anything which might be said about the case out of court, and to not have any communication on any subject whatever with the parties, witnesses, or attorneys in the case, and to avoid, as far as possible, receiving any impression as to the merits of the case other than what should be made upon their minds by the proceedings on the trial. There is no reasonable ground for supposing that either of the jurors failed to faithfully observe these instructions. I do not entertain even a suspicion of wrongdoing on the part of either of the jurors, therefore I am unwilling to insult

them by instituting the inquisition proposed. It is not good practice to admit the testimony of jurors to impeach a verdict rendered conformably to law, and it would not tend to promote the ends of justice to permit a defendant who has been convicted of a heinous crime to turn the tables by putting his triers on trial, on a mere hope of success in an undertaking to extort from them admissions to prove that the verdict may have been based upon prejudice, and not upon the fact of his guilt proved by the testimony of witnesses.

The motion in arrest of judgment challenges the jurisdiction of the court, the sufficiency of the indictment, and the competency of the evidence upon which it was founded. The specific ground for disputing the jurisdiction of the court will be considered in disposing of the third motion. No flaw in the indictment has been pointed out, nor discovered by the court. As to the remaining ground, it would be sufficient to say that the court does not know what evidence was submitted to the grand jury; but I will make an additional explanation: By the motion to quash the indictment, an attempt was made to show that incompetent evidence in the nature of a confession by the defendant was received and considered by the grand jury, and the present motion is a renewal of that attempt. Such evidence was offered on the trial, and it was excluded by the court; nevertheless, the evidence admitted by the court convinced the trial jury of the defendant's guilt, and it is the opinion of the court that it·was amply sufficient to justify the verdict. As the names of the witnesses who testified on the trial are indorsed upon the indictment, there is a necessary presumption that the grand jury was informed by legal evidence of.the important facts, and that, if no evidence except that which the court deems competent had been submitted, a true bill would have been founded upon it. It is not the province of the grand jury to pass upon the ultimate question of the guilt or innocence of an accused person. While that body is engaged in the investigation of his case, he is not permitted to be present, nor can his counsel participate in sifting the evidence then. There is no way provided for a review of the evidence elicited upon the preliminary and secret investigation of a case by a grand jury in its entirety, nor will a court permit itself to become involved in endless entanglements by considering affidavits presenting mere fragments of it. Hence all questions as to the relevancy, competency, and sufficiency of the evidence must be determined upon the trial of the case, after a plea of not guilty. It is only in rare instances, when a court is convinced by a showing of facts that the grand jury has been used as an instrument of persecution, or that fundamental principles of jurisprudence have been disregarded in the proceedings of the grand jury, e. g., by compelling an accused person to appear and give incriminating testimony against himself, or where the grand jury was not composed of qualified persons, that a court will set aside an indictment for reasons not apparent on the face of the record. Wharton's Crim. Pl. & Pr. (9th Ed.) §§ 363–388; 10 Enc. of Pl. & Pr. p. 569; U. S. v. Terry (D. C.) 39 Fed. 355.

An instructive opinion on this branch of the law was rendered by Judge Whitson in the case of the United States v. Wells (D. C.) 163

Fed. 313. The indictment charged a number of persons with criminal conspiracy, some of whom had been compelled to testify before the grand jury and were subjected to brow-beating cross-examinations. There was a quest for big game, and a United States senator was included among those indicted. He had been acquitted by a jury on a trial before Judge Whitson, and, referring to him in the opinion, the judge said:

"The court has occasion to know that there was no ground for the return of the indictment as to one of the defendants, for it must be assumed that the same evidence was adduced upon the trial that was offered to the grand jury."

The indictment was assailed by pleas interposed by some of the defendants, the opinion sustaining the pleas rests upon substantial grounds, and it does not oppose the general proposition that an exception to a good indictment returned by a lawful grand jury appeals to the sound discretion of the court, and the justice of the case rather than mere technical grounds of objection should be the basis of the court's decision. In that view, the court denied the defendant's motion to quash the indictment, and his motion in arrest of judgment will also be denied.

The grounds for a new trial assigned in the third motion are: (1) Irregularities in the proceedings by which the defendant was prevented from having a fair trial. (2) Misconduct of the jury. (3) Insufficiency of the evidence to prove a crime cognizable in this court. (4) Misconduct of the United States attorney. (5) Errors in the rulings of the court during the progress of the trial and in the instructions to the jury, and in refusing instructions requested in behalf of the defendant.

I believe that the trial was fair, that neither the jury nor the United States attorney were guilty of any misconduct, that no error prejudicial to the defendant occurred, and that a second trial would not result in a verdict more favorable to him. The only points raised by the motion which, in my estimation, are of sufficient importance to require an opinion in writing, are those which challenge the jurisdiction of the court and the regularity of the proceedings.

To decide the question as to the jurisdiction of the court, it is necessary to determine three subsidiary questions, viz.: First. At what place was the murder committed? Second. Is that place within the boundaries of a fort over which the government of the United States exercises military authority? Third. Did the government of the United States have exclusive jurisdiction within said boundaries?

The first is a question of fact for the jury to decide, competent evidence was introduced upon the trial, and the verdict is a conclusive determination of the fact that the murder was committed within an inclosed and guarded tract of land actually occupied by United States soldiers, known as "Ft. Worden," the same being a part of the system of fortifications maintained for the defense of Puget Sound. By documentary evidence and court records, it was proved that the government by purchases made, and condemnation proceedings, acquired land on which to establish said fort, and I hold that the validity of the title so acquired, the identification and definite location of the land, and

the accuracy of its boundaries are matters within the scope of the powers and duties pertaining to the executive branch of the government to ascertain and settle, and not subject to judicial scrutiny in the trial of a criminal case. By this I mean that the property rights and the authority of the national government within defined boundaries cannot be disputed in a collateral proceeding by an individual not pretending to have adverse rights or superior authority. As to all such matters the courts respect the authority asserted by the political department of the government. James G. Swan (D. C.) 50 Fed. 108; Jones v. United States, 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691; Benson v. United States, 146 U. S. 331, 13 Sup. Ct. 60, 36 L. Ed. 991.

The constitutional provisions and laws applicable to this branch of the case are as follows:

The eighth section of article 1 of the Constitution of the United States vests in Congress, power to provide for the common defense and general welfare of the United States, and—

"to exercise exclusive legislation in all cases whatsoever, over such District (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

The Legislature of the state of Washington consented to the acquisition of lands for the public uses of the United States, including the erection of forts, and ceded to the United States jurisdiction over all such lands as may have been or may be hereafter acquired by purchase or by condemnation, or set apart by the general government for any or either of the purposes aforementioned by statutes enacted January 23, 1890, and February 24, 1891. See Laws Wash. 1890, p. 459; Laws Wash. 1891, p. 31, c. 18; Pierce's Code (Ed. 1905) pp. 1630, 1631, §§ 8900–8902 (Ballinger's Ann. Codes & St. §§ 2947, 2110, 2111). The text of the later of these two statutes is as follows:

"That the consent of the state of Washington be and the same is hereby given to the acquisition by purchase or by condemnation, under the laws of this state relating to the appropriation of private property to public uses, by the United States of America, or under the authority of the same, of any tract, piece or parcel of land, from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state, for the sites of locks, dams, piers, breakwaters, keepers' dwellings, and other necessary structures and purposes required in the improvement of the rivers and harbors of this state or bordering thereon, or for the sites of forts, magazines, arsenals, docks, navy yards, naval stations, or other needful buildings authorized by any act of Congress, and all deeds, conveyances of title papers for the same shall be recorded, as in other cases, upon the land records of the county in which the land so acquired may lie; and in like manner may be recorded a sufficient description by metes and bounds, courses and distances, of any tract or tracts, legal divisions or subdivisions .of any public land belonging to the United States which may be set apart by the general government for any or either of the purposes before mentioned by an order, patent or other official document or papers describing such land; the consent herein and hereby given being in accordance with the seventeenth clause of the eighth section of the first article of the Constitution of the United States, and with the acts of Congress in such cases made and provided, and the jurisdiction of this state is hereby ceded to the United States of America over all such land or lands as may have been or may be hereafter acquired by purchase or by condemnation or set

168 F.—10

apart by the general government for any or either of the purposes before mentioned: Provided, that this state shall retain a concurrent jurisdiction with the United States in and over all tracts so acquired or set apart as aforesaid, so far as that all civil and criminal process that may issue under the authority of this state against any person or persons charged with crimes committed, or for any cause of action or suit accruing without the bounds of any such tract, may be executed therein in the same manner and with like effect as though this assent and cession had not been granted."

Congressional authority for acquiring the site for Ft. Worden is found in acts making appropriations for fortifications and coast defenses. By an act approved June 6, 1896 (Act June 6, 1896, c. 338, 29 Stat. 257 [U. S. Comp. St. 1901, p. 832]), $500,000 was appropriated for the procurement of land, or rights pertaining thereto, needed for the site, location, construction, or prosecution of works for fortifications and coast defenses. Other appropriations were made for similar purposes by acts approved March 3, 1897, 29 Stat. 641, c. 384; May 7, 1898, c. 248, 30 Stat. 400; March 3, 1899, c. 428, 30 Stat. 1250.

Under general authority conferred upon the Secretary of War by Congress (Act Aug. 18, 1890, c. 797, 26 Stat. 316 [U. S. Comp. St. 1901, p. 2518]), these appropriations were expended by military officers subject to the direction of the Secretary of War, and the United States attorney has furnished me with transcripts of records of the War Department, showing that out of these appropriations the necessary sums were allowed for the specific purpose of paying for the site of Ft. Worden.

The question as to the exclusiveness of national authority over Ft. Worden is distinct and separable from the more comprehensive question as to the general scope of national authority by reason of the fact that the definition of murder as a crime against the government of the United States, if committed within a state, includes locality as an essential element; the guilty act must have been committed at a place within the exclusive jurisdiction of the United States, so that exclusiveness of jurisdiction of the national government is an element of the crime and one of controlling importance, affecting the jurisdiction of the court to deal with the murderer.

Early in the history of our government, Mr. Justice Story expounded the seventeenth paragraph of the eighth section of article 1 of the Constitution in the case of the United States v. Cornell, Fed. Cas. Nos. 14,867, 14,868. He decided that the phrase "exclusive legislation" comprehended the idea of exclusive jurisdiction, and that when a purchase of land for any of the purposes enumerated in that clause—

"is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the Constitution ipso facto falls within the exclusive legislation of Congress, and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the State Legislature is by the very terms of the Constitution, by which all the states are bound, and to which all are parties, a virtual surrender and cession of its sovereignty over the place."

Referring to a clause reserving the right to make service of judicial process of the state contained in the act of the State Legislature consenting to the purchase by the United States government of a site for

a fort, similar in phraseology to the reservation clause in the act above quoted, the learned justice said:

"Not a word is said from which we can infer that it was intended that the state should have a right to punish for acts done within the ceded lands. The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice, for acts done within the acknowledged jurisdiction of the state. Now there is nothing incompatible with the exclusive sovereignty or jurisdiction of one state that it should permit another state, in such cases, to execute its processes within its limits. And a cession, or exclusive jurisdiction, may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise as, quoad hoc, his own process; * * * and we have not the least hesitation in declaring that a true interpretation of the present proviso leaves the sole and exclusive jurisdiction of Ft. Adams in the United States."

Justice Story's interpretation as quoted harmonizes with the decision of the Supreme Court in the case of Benson v. United States, 146 U. S. 326, 13 Sup. Ct. 60, 36 L. Ed. 990. In that case it was further held by the Supreme Court that, without proof of any affirmative act of acceptance by the national government, acceptance of the cession of jurisdiction was to be presumed.

From the laws and proceedings above set forth and the authorities cited, I draw the conclusion that the Constitution vests in the national government exclusive jurisdiction over places occupied and used for military purposes when a site has been acquired with the consent of the Legislature of the state; that the Legislature of this state consented in advance to the acquirement of sites for forts and military posts when authorized by Congress; that, acting under authority conferred by Congress, officers of the United States army, under the direction of the Secretary of War, selected the site of Ft. Worden, and have constructed thereon fortifications and defensive works; and that, at the time of the commission of the crime of which the defendant is accused, the fort was occupied by soldiers of the United States army, and in use as a military post, and that by the verdict of the jury, it has been conclusively determined that said crime was committed within the boundaries of said fort, and therefore at a place within the exclusive jurisdiction of the United States.

The alleged irregularities in the trial of the case, consist of the action of the court in permitting the jurors to separate during adjournments and recesses, and in the refusal of the court to exclude the jury from the courtroom, when requested to do so by the defendant's counsel, in order to permit them to present motions and argue questions of law without the presence and hearing of the jurors. There was no departure from the practice of this court, which has been uniform during the period of 19 years since it was organized, and, although different from the practice in some other courts, nevertheless I am fully convinced that no legal or prejudicial error was committed. The most that can be hoped for from juries in the way of justice and the maintenance of individual rights and the upholding of the laws of the land is that they shall be composed of intelligent, fair-minded, honest men, who have respect for the laws and courage to stand for the principles which they believe in; that the proceedings in criminal

trials in which they participate, shall be conducted without passion or prejudice, and with a purpose to elicit the truth and render true and just verdicts. I deny that in order to be fair towards an accused person, whether he be in fact guilty or innocent, it is necessary or proper to imprison jurors as if they were culprits, or to continually insult their intelligence by excluding them from the hearing of any motion or argument which it is proper for the presiding judge to hear, on a mere supposition that prejudice may be germinated in their minds by hearing the contentions of counsel and the rulings of the court. To so hold it would be necessary to presume that jurors are incapable of understanding rightly what they hear during the progress of a trial, and of discriminating between things that are proper and improper in the application of the law to the facts which they must ascertain, or that by reason of their lack of mental acumen or moral virtue they are objects of suspicion and unfit to be intrusted with the determination of rights dependent upon law and legal evidence. This expression of ideas may shock fogyism, but I believe that it will meet with the approval of conservative believers in the virtue of the jury system, and that it accords with sound principles of jurisprudence.

Holding these views, I cannot convict the court of any irregularities entitling the defendant to a new trial.